OSTANO COMMERZANSTALT and Dr. Herbert Jovy, Plaintiffs,

v.

TELEWIDE SYSTEMS, INC. and Bernard L. Schubert, Defendants.

No. 82 Civ. 4721 (RLC).

United States District Court, S.D. New York.

April 8, 1985.

Walter, Conston & Schurtman, P.C., New York City, for plaintiffs; William M. Barron, Nicholas P. Giuliano, New York City, of counsel.

Hall, Dickler, Lawler, Kent & Howley, New York City, for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

### I

Plaintiff Ostano Commerzanstalt ("Ostano") is a Liechtenstein company with its principal place of business in Switzerland. Plaintiff Dr. Herbert Jovy is a citizen and resident of West Germany and pursuant to a power of attorney from Ostano has acted on the latter's behalf and on behalf of its affiliate Technische Systeme Consult Gmbh. & Co. Communication International KG ("TSC") in this lawsuit. Ostano is owned by Jovy's wife and TSC is owned by Jovy's wife and son, Hanns-Arndt Jovy. Until 1983 TSC's general manager was a Dr. Heinrich Tichawsky, but that position is now filled by young Jovy.

Defendant Telewide Systems, Inc. ("Telewide") is a Delaware corporation with its principal place of business in New York City at 118 East 65th Street. Defendant Bernard L. Schubert, a citizen of New York and resident of New York City, is the president and sole shareholder of Telewide.

Plaintiffs instituted this action alleging that Telewide is guilty of breach of contract and breach of warranty as licensor of twenty-six feature films in the geographical area comprising the two Germanies, Austria, Switzerland, Holland, Luxembourg, Belgium and France ("the territory") granting the licensee exclusive rights to rent, sell, distribute or otherwise exploit these films. Plaintiffs allege that the term of the license agreement is twelve years beginning May 13, 1980, and that Ostano stands in the shoes of the original licensee, Video Communications Inc. ("VCI"), as assignee.

Plaintiffs allege that Schubert is guilty of fraud and fraudulent misrepresentation. They seek both compensatory and punitive damages. Plaintiffs also allege that since the defense was frivolous and fraudulent evidence was introduced at trial, plaintiffs are entitled to an award of attorney's fees to be assessed against defendants and their counsel.

There is remarkably little real dispute among the parties concerning the basic facts in this controversy. Defendants admit to some representations which were known to be false when made. Schubert's testimony at trial has been marked by inconsistencies between what he said on the witness stand, in earlier deposition testimony, and in letters and telexes written or issued when the events at issue unfolded. Nonetheless, the area of factual dispute is quite narrow.

The case was tried to the court April 16–23, 1984. The testimony adduced at the trial established the following facts: Jovy was in the United States early on in 1980, and was told by a business associate in Houston that VCI had a great many television films. Jovy was interested in selling, leasing and distributing TV films in the territory. Jovy flew to Tulsa and had several conversations with VCI's president Bill Blair about securing the right to distribute, sell, rent, etc. various films in the territory.

In the previous year Blair had had discussions with Schubert about VCI becoming an exclusive licensee for the sale and distribution of various Telewide films. Nothing had come of these discussions. When Blair met Jovy he had in his possession a list of Telewide films he had received from Schubert in connection with these earlier conversations, and he showed this listing to Jovy. Jovy had Tichawsky, a film expert, go over the list, and Tichawsky selected twenty-six films that he felt would do well in the territory.

Blair advised Schubert of his discussions with Jovy, and Blair and Schubert thereafter entered into a licensing agreement dated May 13, 1980. Pursuant to this agreement VCI was given "exclusive rights to distribute, rent, exhibit, exploit, transmit, release, sublease or otherwise market [twenty-six motion pictures listed for twelve years beginning May 15, 1980, and ending May 31, 1992 in the territory] by means of aural and visual television." The licensee was obligated to pay $442,000, or $17,000 per title, 10% ($44,200) of which was to be paid immediately with the balance ($397,800) to be paid on receipt of laboratory letters addressed to laboratories, persons or firms in which any of "the pre-print materials or elements of the pictures are located." These letters were notice of VCI's right to order 16 mm. prints, video tapes and disks. The agreement certified that Telewide "has the right without any limitation or restriction whatsoever to grant [VCI] the exclusive license to lease" the twenty-six motion pictures and "the full right, powers, and authority to enter into and perform this agreement." Plaintiffs' Ex. 1A.

The titles of the twenty-six films were listed in a Schedule A attached to the agreement. They were: Betrayed Woman, Big Tip-Off, Blue Gardenia, Cash On Delivery, Devil's Harbor, Fighter, Gilded Cage, Girl Of The Night, Trapped, Last Rebel, Las Vegas Story, Lucky To Be A Woman, Main Street To Broadway, Marry Me Again, Mourning Becomes Electra, Night Freight, Port Of Hell, Port Of New York, San Francisco Story, Shanghai Gesture, Sun Sets At Dawn, Sword Of Venus, Toughest Man Alive, Treasure Of Ruby Hill, Women in Paradise and Impulse.

About a week after the agreement between Telewide and VCI was concluded, on or about May 20, 1980, Ostano and VCI entered into an agreement for VCI to license these twenty-six films to Ostano at $27,000 per negative for each film. Jovy, before entering the agreement with Blair, discussed the status of the copyrights to the films, who possessed negatives and Ostano's right of access. Blair assured

him that the films' copyrights were held by Telewide and that Jovy could secure prints from negatives on receipt from VCI of appropriate letters of access.

In September, 1980, Jovy again asked Blair about the copyright status of the twenty-six films he was interested in since he had heard rumors that some of the films had no copyright protection. (Pl.Ex. 4). Blair advised Jovy by telex on September 3, 1980, that he had a call into Telewide about this and that he had "paid for exclusive and will demand same." (Pl.Ex. 5). On September 5, 1980, after being given Schubert's assurances on the matter or at the least implying to Jovy that he had received Schubert's assurances, Blair telexed Jovy that "none of the films are in [the] public domain. All are protected by copyright." (Pl.Ex. 6).

Blair and Jovy renegotiated the May 20, 1980 agreement, replacing it with a contract dated November 26, 1980. Ostano licensed its rights in West Germany under that agreement to TSC. Ostano or TSC made payments to VCI by March 19, 1981, totalling $512,021.75, and as of March 10, 1981, VCI had paid Telewide some $422,-000.

Between roughly mid-1980 and the beginning of 1981, Jovy and Tichawsky had three meetings with representatives of Springer Publications, a large European publisher which was in the process of purchasing a television channel. They discussed the possibility of Springer leasing from TSC some of the films that TSC held, including the twenty-six involved in this litigation. Films are leased in Germany, as I understand it, for television distribution at a fixed price of 126,000 Deutschmarks ("DM") per film. Discussions embraced twelve of the twenty-six films involved in the agreement with VCI. Prices in excess of DM 126,000 were discussed for three of these films. Nothing came of the discussions. Jovy testified that Springer learned that an Italian interest claimed possession of the copyright to Lucky To Be A Woman, which was one of the key films of interest

to Springer. Jovy traced Springer's failure to come to agreement with TSC to his learning that TSC did not hold the copyright to Lucky To Be A Woman.

The critical issue that probably generated the start of the trek to the courthouse was Jovy's concerns about copyright protection for the films covered by the agreement and the failure of VCI to clear that matter up. Jovy sought assurances that VCI possessed copyright protection for Lucky To Be A Woman, Trapped, Shanghai Gesture, Girl Of The Night, Last Rebel, and Mourning Becomes Electra. On June 17, 1981, Eugene Dennison, VCI's attorney, wrote to Schubert asking "[p]ursuant to our discussions this date [for] immediate clearance on rights to 'Girl Of The Night', 'Shanghai Gesture', 'Lucky to be a Woman', 'Sword of Venus', 'Woman [sic] in Paradise', 'Last Rebel' [and] 'Mourning Becomes Electra'". (Pl.Ex. 35). On June 24, 1981, Schubert wrote Dennison that Lucky To Be A Woman was the only title of those listed in the latter's June 17, 1981 letter that "we believe to be in dispute. We had substituted Trapped for it several months ago...." He added that prints had been ordered for the balance of the titles and were expected shortly. (Pl.Ex. 41).

On July 10, 1981, Dennison asked Schubert for access letters for the Last Rebel, Shanghai Gesture, Women In Paradise, Girl Of The Night and Sword Of Venus and substitutes for Blue Gardenia and Lucky To Be A Woman. (Pl.Ex. 42). On July 13, 1981, Schubert wrote Dennison in response to the latter's advice that third parties were claiming rights to Shanghai Gesture and Girl Of The Night, that he was investigating their status (Pl.Ex. 44), and offered to substitute Pancho Villa Returns, Caltiki The Immortal Monster and Amorous Mr. Prawn for Blue Gardenia and Lucky To Be A Woman (Pl.Ex. 43). Plaintiffs refused this offer.

On September 19, 1981, plaintiff instituted suit against VCI in the Northern District of Oklahoma. On November 9, 1981, the Oklahoma litigation was settled. As part of the settlement Ostano was assigned all of VCI's rights under the May 13, 1980 license agreement between Telewide and VCI. The next day, November 10, 1981, Jovy flew to New York and met with Schubert personally. During this meeting Jovy requested laboratory access letters for the films and stressed his need for documentation as to copyright protection for the films. Schubert was cooperative. He indicated that there might be some problem concerning Lucky To Be A Woman and possibly Mourning Becomes Electra but assured Jovy that substitutions would be supplied.

From December 2, 1981, onward, however, Schubert manifested a changed attitude. In a December 2, 1981 letter to Jovy, he wrote advising of receipt of notice from VCI assigning its contract directly to "your organization." He told Jovy that he had consulted his attorneys and as soon as he heard from them, he would be in touch. (Pl.Ex. 13). Subsequently in a December 28, 1981 letter to Jovy, Schubert wrote "[y]ou were advised when you met with me, that our agreement with V.C.I. did not permit an assignment of the license agreement without our approval." (Pl.Ex. 15). On February 28, 1982, Schubert wrote to Jovy denying the existence of any license agreement between him and TSC and asserting that the license agreement did not give VCI "the right to assign their contract." Schubert added, "[S]ince there appear to be many disputes, we will not agree to the assignment of the contract dated May 13, 1980. I should also caution T.S.C. that we are the owners to [sic] the copyrights on the various films licensed to V.C.I. Any unauthorized use of this material will result in a violation of international copyrights law, and the offender will be held strictly accountable." (Pl.Ex. 16).

In response to a June 23, 1982 letter from plaintiffs' New York counsel, Schubert wrote "[w]e are prepared to deliver access letters on all of the titles we have available under the V.C.I. contract," with the exception of Shanghai Gesture, Lucky To Be A Woman and Girl Of The Night, and "to make an adjustment on the V.C.I.

contract." (Pl.Ex. 64). In a letter of the same date defendants' counsel advised plaintiffs' New York counsel that "Telewide does not take the position that it will not recognize your client as assignee entitled to the rights granted to VCI under the contract between Telewide and VCI." (Pl.Ex. 29).

Plaintiffs seek $5,518,038.24 in damages against Telewide and Schubert jointly and severally for fraud and fraudulent breach of warranty. In the alternative, plaintiffs seek $5,518,038.24 in damages against Telewide for breach of warranty and breach of contract. In addition plaintiffs, on the grounds that the affirmative defenses asserted in the action and maintained throughout several days of trial were frivolous and without merit and known by counsel to be so before suit commenced, seek $1,000,000 in punitive damages against Telewide and Schubert, plus an award of attorney's fees against defendants and their counsel, Hall, Dickler, Lawler, Kent & Howley, the amount of the award to be subsequently determined by the court. Moreover, plaintiffs contend defendants and their counsel produced concocted evidence and fraudulent documents in an attempt to support a claim of full disclosure to VCI. Plaintiffs charge defendants and their counsel with participating in the attempted perpetration of this fraud.

Defendants deny the fraud charge and contend that plaintiffs incurred no damages because of their acts. They also deny plaintiffs' claim that Schubert introduced fabricated and fraudulent evidence at the trial. In the pretrial order defendants concede that Telewide had no distribution rights in the territory for Lucky To Be A Woman, Shanghai Gesture, Girl Of The Night, Impulse, Gilded Cage, and Las Vegas Story and no copyright registration for Lucky To Be A Woman, Women In Paradise, The Fighter, Port Of New York, Sun Sets At Dawn, Sword of Venus and Trapped. The evidence at trial showed that Telewide had no distribution rights in the territory to five additional films: Blue Gardenia, Devil's Harbor, Last Rebel, San Francisco Story and Women In Paradise.

## II

The evidence is uncontroverted that Schubert knew when he signed the May 13, 1980 license agreement that he had no authority to license the twenty-six films in question for distribution in the territory. While defendants contend that the May 13, 1980 agreement made no representation as to copyright, the agreement does purport to grant the "exclusive right to distribute, sell, exhibit etc." Schubert testified at trial that having the copyright was not important. What was critical was possession of the negative. In the context of this case, that contention is irrelevant. An exclusive license "is the permission to do a thing, and a contract not to give leave to any one else to do the same thing." *Overman Cushion Tire Co. v. Goodyear Tire and Rubber Co.*, 59 F.2d 998, 999 (2d Cir.), *cert. denied sub. nom. Kelly-Springfield Tire Co. v. Overman Cushion Tire Co.*, 287 U.S. 651, 53 S.Ct. 97, 77 L.Ed. 562 (1932). As to the twenty-six titles involved, defendants had no authority or power to grant an exclusive license in the territory to anyone. Schubert knew when he signed the agreement that he and Telewide lacked the authority to grant to VCI what the license agreement purports to authorize. Jovy and Tichawsky testified that for their purposes Lucky To Be A Woman, Blue Gardenia, Trapped, Girl Of The Night, Port Of New York, Shanghai Gesture, Fighter and San Francisco Story were the critical films. The value of the license to Ostano and TSC was dependent upon their ability to market the above eight films. Jovy testified that in Germany TV stations will buy blocks of films if various critical films are in the package.

Defendants contend that Jovy and Ostano knew that Telewide did not hold rights to many of these films and that, therefore, there can be no actionable claim for fraud or fraudulent representation, citing *200 East End Avenue Corp. v. General Electric Co.*, 5 A.D.2d 415, 172 N.Y.S.2d 409

(1st Dep't.1958), *aff'd*, 6 N.Y.2d 731, 185 N.Y.S.2d 816, 158 N.E.2d 508 (1959); *Rosenbloom v. Adams, Scott & Conway, Inc.*, 521 F.Supp. 372 (S.D.N.Y.1981) (Cooper, J.), *aff'd mem.*, 688 F.2d 816 (2d Cir. 1982). These cases, one on the basis of New York law, the other on the basis of California law, hold that one with actual knowledge of the facts cannot use those facts as the basis for a fraud claim. To bring plaintiffs within the ambit of that proposition, it would have to be established that they knew prior to entering the May 20, 1980 agreement with VCI that Telewide and Schubert had no authority in re the twenty-six films in question to grant or transfer any licensing or distribution rights to Ostano or TSC.

At best the record supports knowledge on plaintiffs' part only after assignment of VCI's rights in the May 13, 1980 licensing agreement to Ostano in November, 1981. The record shows that in the spring of 1980, Jovy, while in Houston, heard about VCI's possession of a large number of films. He went to Tulsa in an attempt to acquire the right to exploit various suitable films he and Tichawsky selected for TV sale and distribution in the territory. Jovy was concerned about copyright to these films and sent his son to Washington, D.C. in May, 1981, to check on that. The son was unable to make any conclusive determination one way or the other. Subsequent to his Washington visit the son spoke by telephone to Schubert about a third party claim to the German track to Lucky To Be A Woman, but Schubert assured him that he held the rights to that film from a bankrupt Italian company. That satisfied young Jovy. While plaintiffs were VCI sublicensees, they were not able to deal directly with Schubert. Indeed, the Oklahoma litigation makes clear that plaintiffs attributed their problems and frustrations to VCI. When plaintiffs agreed to settle the Oklahoma litigation in exchange for VCI's assigning to them all their rights to the May 13, 1980 license agreement with Telewide, plaintiffs did so in the belief and expectation that they had gained something of value. Since they now could deal

with Schubert directly, plaintiffs felt confident that the problems that heretofore had plagued them in their dealings with VCI would be resolved.

■ An exclusive license is enforceable under traditional contract analysis. *See, e.g., Rohauer v. Killiam*, 37 A.D.2d 547, 322 N.Y.S.2d 589 (1st Dep't.1971). Telewide clearly breached the agreement. Telewide could not and did not provide the exclusivity the agreement called for. Telewide failed to provide the laboratory access letters as required by the agreement. These letters were needed for Ostano to secure prints and preprint material to market the films. Moreover, Schubert wrongfully repudiated Telewide's contractual obligations to Ostano on learning that the VCI rights in the May 13, 1980 agreement had been assigned to Ostano. The statement to Jovy that VCI had no authority to assign its rights to Ostano was without foundation. The May 13, 1980 agreement had no such restriction. His threats to move against Ostano and Jovy for copyright infringement were fraudulent as well, since neither he nor Telewide had standing to bring such an action.

■ Telewide expressly warranted that it held exclusive rights to the twenty-six films and that it had the right to grant an exclusive license to a third party to distribute the films in the territory. As we have seen, Telewide had no authority to grant distribution rights in the territory to eleven of the twenty-six films, and Schubert knew this when he signed the agreement. Accordingly, Telewide was guilty of breach of warranty from the very inception of the agreement. *Ainger v. Michigan General Corp.*, 476 F.Supp. 1209 (S.D.N.Y. 1979) (Cannella, J.), *aff'd*, 632 F.2d 1025 (2d Cir.1980). While there is some confusion as to whether under New York law a showing of reliance is necessary for recovery of a breach of warranty, *id.*, the record is clear that Jovy paid a half million dollars to VCI in reliance on Telewide's having valid and exclusive ownership to the rights to twenty-six films he wanted to distribute and the

authority to license, distribute and exploit those films in the territory.

Schubert was guilty of fraud and fraudulent representation. The 1979 Blair-Schubert negotiations concerning VCI's buying a Telewide film library came to nothing until Jovy met with Blair in 1980. Blair advised Schubert of Jovy's interest in being licensed to distribute twenty-six Telewide films in the territory, and asked Schubert if he was willing to make a deal. Schubert agreed, and the May 13, 1980 agreement was signed. The license to VCI was clearly in contemplation of VCI sublicensing the rights it secured to Jovy. Schubert denies that he knew anything about Blair's dealings with Jovy, but his statements, like most of his testimony, cannot be credited. Schubert represented in the May 13, 1980 agreement exclusive ownership to twenty-six films and the right to grant VCI an exclusive license to distribute those films in the territory. He knew as to eleven of those films that this representation was false. Ostano, as VCI's assignee under the May 13, 1980 agreement, acquired VCI's claims for fraud and fraudulent representations in that agreement. *American Hemisphere Marine Agencies, Inc. v. Kreis,* 40 Misc.2d 1090, 244 N.Y.S.2d 602 (S.Ct.N.Y. Co.1963); *Viacom International, Inc. v. Tandem Productions, Inc.,* 368 F.Supp. 1264, 1274 (S.D.N.Y.1974) (Gurfein, J.), *aff'd,* 526 F.2d 593 (2d Cir.1975).

■ Under New York law a prima facie case of false representation is made on a showing of a representation as to a material fact, that the representation was false and was made knowing that it was false, and that the party claiming to be victimized relied on the representation to his detriment. *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). The record is clear that all of these elements are present in this case. The representations as to exclusive ownership of the films and power to license them for distribution in the territory were material; these representations were false and known by Schubert to be false at the time

he made them, and Jovy and Ostano relied on them to their detriment.

■ Defendants argue that plaintiffs suffered no damages but that argument is without merit. Ostano paid $512,071.75 for a worthless license. Ostano contends that it lost a lucrative contract with Springer because of the cloud on its right to distribute some of the films in question. While damages need not be proved with precision as long as there is a reasonable basis in the record supporting the damages alleged, *Lexington Products, Ltd. v. B.D. Communications,* 677 F.2d 251 (2d Cir.1982), evidence concerning a putative agreement with Springer was not sufficient to show that a contract would have been signed but for the problem of Telewide's rights to the film. It is true that there was testimony of three meetings between TSC and Springer representatives. It is also true that an apparent accord was reached as to prices for some films. However, a great many films were discussed not only the twenty-six Telewide films, but also many others. Nothing came of these discussions. From the meager evidence in the record, I am not satisfied that but for Springer's hearing that Lucky To Be A Woman belonged to someone else, he would have signed an agreement with TSC.

■ While the Springer discussions cannot be the basis for an award of compensatory damages, what plaintiffs paid for had value. Defendants as part of their affirmative defenses have placed a value of $750,000 on an exclusive license, such as plaintiffs thought they had in the territory, in Zaire and Morocco. Plaintiffs have shown that there are 761,000 TV sets in those two countries. (See Ex. 57, the World Almanac). In the territory the number of TV sets is 51,705,000. *Id.* Taking defendants' figures for Morocco and Zaire there seems to be almost a one to one relationship between the value of an exclusive license and the number of TV sets. Thus, the value of an exclusive license in the territory would approximate $50,000,000. Thus, placing a value of an exclusive license in the territory at five times greater than a license for

Morocco and Zaire would not appear to be unreasonable. On the basis of that approach, the value of the license in the territory approximates $3,750,000. Therefore, plaintiffs' compensatory damages should be $3,750,000 plus $512,021.75 they paid for the worthless and fraudulent license, or $4,262,021.75.

Accordingly, for breach of contract and breach of warranty, plaintiffs are entitled to recover $4,262,021.75 against Telewide in compensatory damages. For false representation, fraud, and breach of warranty, plaintiffs are entitled to recover against Telewide and Schubert jointly and severally $4,262,021.75.

 The fraud here was so blatant and egregious that punitive damages are virtually mandated. Moreover, the defendants and their counsel misused the court process by pressing a defense known to have no merit. They contended until well into the trial that Jovy's rights were flawed since VCI had no right of assignment. Finally that claim was abandoned, but counsel knew it had no merit at the outset. In addition, the evidence is persuasive and convincing that Schubert fabricated evidence and introduced this false evidence at trial as genuine, and that counsel knew, or at least had reason to suspect, that the evidence was not genuine but sought to help his client mislead the court.

During Schubert's testimony Defendants' Ex. U was introduced purporting to establish that Schubert had disclosed to VCI everything concerning Telewide's rights to the twenty-six films. Ex. U is a fake. All Telewide letterhead stationery introduced in this case from September, 1979, to July 8, 1981, has a telex number. All Telewide letterhead stationery subsequent to July 8, 1981 has no telex number. Ex. U, purportedly written in April, 1980, is on Telewide stationery without the telex number. Moreover, Ex. U shows a variety of typographical errors indicating amateur typing. Examples: The n in Eugene (Dennison), Esq. is typed over, there is no space between the comma and Esquire. There is a percentage sign before Video Communi-

cations, Inc. for % to indicate in care of; there is no space between the comma after Communications and Inc. In the first line of the message the tr in contracts is typed over. There is no apostrophe in Devil's Harbor. The r in Port Of Hell is typed over. Sets in Sun Sets At Dawn is in lower case. There are other errors of this type but these examples are sufficient to show the uniqueness of this document. All other Telewide letters have the professional touch.

Moreover, purportedly enclosed in the letter (Ex. U) are copies of contracts for listed films, one of which is Port Of Hell. In a letter to Dennison dated July 16, 1980, (Ex. V), Schubert sent copies of contracts for listed films, one of which is Port Of Hell. Also in both the April 17, 1980 letter (Ex. U) and the July, 1980 letter (Ex. V) is the same message. The April 17 letter states, "Please remember, American Leisure was the successor to Lin Medallion, the successor to Medallion Films." The letter dated July 16, 1980, states "For the record, American Leisure was the successor to Lin Medallion, the successor to Medallion Films". Ex. U was never produced for plaintiff's counsel before trial although his discovery requests required its production. Indeed, defendants' counsel had never seen the letter until Schubert showed it to him the night before it was introduced.

The many simple errors and lack of a teletype number present on all Telewide letterhead stationery during the time the letter was purportedly typed, the fact that it had not been produced for plaintiffs' counsel and that defendants' counsel had never seen it give credence to plaintiffs' contention of recent fabrication.

Counsel for defendants told the court when the letter was first introduced that it had been seen by plaintiffs' counsel. Defendants' counsel said "it is my recollection that it was available for document discovery. But since I am not positive, I will not quarrel with Mr. Barron's statement" (Tr. 624). Later defendants' counsel said in response to the court's statement that Mr. Barron's complaint was that he never had

seen Ex. U, "I can't say that he did or did not. These documents were made available for inspection. I honestly cannot tell you whether specifically that document was there or not at the time". (Tr. 692). He further embellished that remark by adding, "All I am saying is that to my best recollection those documents were made available during pretrial document production." (Tr. 693).

However, at a hearing on May 24, 1984, on defendants' motion to reopen the trial, when pressed by the court, defendants' counsel admitted that he had never seen the document until it was presented to him the night before it was produced in court. If plaintiffs' counsel's diligence had not caught all the gross errors in Ex. U and the discrepancy as to the teletype number as well as the enclosure of a copy of the contract for the same films in the suspect letter dated April 17, 1980, and a later letter dated July 16, 1980, it is clear that defendants' counsel would have continued to tell the court that this recently produced letter had been seen by Mr. Barron. He knew when he first told the court that the letter had been available during document production that he had not seen it himself at that time.

The record suffices to show counsel, at a minimum, cooperated with his clients' effort to corrupt the court record with a fraudulent piece of evidence. It was counsel's responsibility to have disclosed to the court when the issue arose that he, like Mr. Barron, had never before seen Exh. U. Instead, he sought to give the impression that the document had been available to Barron and by implication that he, counsel for defendants, had seen the document during the time of document production as well.

Plaintiffs are clearly entitled to an award of punitive damages for defendants' egregious conduct. While the purpose of punitive damages is to punish and deter bad conduct and evidence of a party's wealth is material in determining what amount of punitive damages is appropriate, *Varriale v. Saratoga Harness Racing,*

*Inc.,* 76 A.D.2d 991, 429 N.Y.S.2d 302 (3d Dept.1980); *Rupert v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904 (4th Dep't.1975), no evidence concerning defendants' financial resources were put in the record. However, defendants were on notice from the initiation of this litigation that plaintiffs were seeking punitive damages. It was defendants' burden to show their net worth, if they desired that to be a consideration in mitigation of damages. *Zarcone v. Perry,* 572 F.2d 52 (2d Cir.1978). *See also Micari v. Mann,* 26 Misc.2d 422, 481 N.Y. S.2d 967 (Sup.Ct.N.Y.Co.1984). *But cf. Chilvers v. New York Magazine,* 114 Misc.2d 996, 453 N.Y.S.2d 153 (Sup.Ct.N.Y. Co.1982). Taking into account the deliberate and willful nature of defendants' fraud and misrepresentation, Schubert's persistence in his misrepresentations on the witness stand and the introduction of fabricated testimony, punitive damages of $500,000 are awarded against Schubert and Telewide jointly and severally.

Plaintiffs are also entitled to an award of attorney's fees in this case. The affirmative defense asserted that VCI had no authority to assign the license to plaintiffs was clearly without merit and known to be without merit from the outset. A year before this case was tried, plaintiffs moved for partial summary judgment striking the affirmative defense. Defendants opposed the motion alleging that additional discovery was needed to determine the validity of the assignment. The motion was denied. However, defendants knew then that there was nothing they were likely to uncover in plaintiffs' records on that question. This conduct might be overlooked, but when it is coupled with Ex. U and counsel's cooperation with Schubert in attempting to mislead the court, sanctions become warranted.

The court will award attorney's fees to plaintiffs to be assessed against both defendants and their counsel, Hall, Dickler, Lawler, Kent & Howley, jointly and severally. Plaintiffs are to submit proof of attorney's fees expended in this litigation, supported by counsel's affidavit and a

memorandum of law. Defendants may file opposing affidavits and a memorandum of law. The matter will be determined on those submissions unless something additional is required. Plaintiffs' submission should be filed within three weeks from the date of the order to be entered herein. Defendants' opposition papers should be filed one week later.

In sum plaintiffs are granted judgment against Telewide for breach of contract and breach of warranty in the sum of $4,262,-021.75. Plaintiffs are granted judgment jointly and severally against Telewide and Schubert for fraud and fraudulent representation and fraudulent breach of warranty in the sum of $4,262,021.75. On each of these judgments plaintiffs are entitled to recover prejudgment interest from May 20, 1980. Plaintiffs are granted punitive damages assessed jointly and severally against Schubert and Telewide in the sum of $500,-000. Finally, plaintiffs are entitled to an award of attorney's fees to be assessed against defendants and their counsel. Plaintiffs are to recover their costs.

Plaintiffs should submit an order and judgment for the court's signature on notice to defendants, and defendants may submit a counter order.

IT IS SO ORDERED.