Gabrielli, J.
Plaintiff, a collector of rare Russian enamels, placed approximately 300 of his acquisitions, valued at $731,000, in storage with defendant, a commercial bailee, on the eve of an extended trip to Europe. When he sought their return, defendant was unable to redeliver the bailed goods, they having been stolen from its warehouse. After advertising that he would pay a reward for their return, plaintiff recouped most of the stolen items by paying an unidentified "intermediary” a $71,000 ransom. In this action, plaintiff seeks to recover that sum and the value of 19 other items not returned.
The jury awarded plaintiff $45,000 as the reasonable ransom payment and $27,000 for the items not recovered. By a divided vote, the Appellate Division affirmed (46 AD2d 19). Defendant appeals only from so much of the order entered below as affirmed the ransom payment award.
Upon the trial and during plaintiff’s cross-examination he declined to divulge the name of the intermediary with whom he dealt on the stated ground that his physical well-being and that of his wife and children had been threatened. The issue, created by defendant, is whether plaintiff can successfully maintain this action.
Testimony adduced at trial established, without contradiction, that on June 12, 1970 prior to leaving for Europe, plaintiff delivered the Russian enamel collection to defendant for safe keeping. On July 28, 1970 an individual called defendant and, claiming to be plaintiff, said that he was sending someone over to pick up the collection. Without checking the messenger’s identity, defendant turned over possession of the bailed items. Upon returning in August, plaintiff received a statement from defendant indicating that his storage space had been vacated and when plaintiff advised defendant that the stored goods had not been removed by him or at his direction, defendant caused an inquiry to be made and learned, for the first time, that the collection had been stolen.
The assistance of the New York City Police Department and the Federal Bureau of Investigation was enlisted but to no avail. The plaintiff also, in conjunction with his insurer, placed an advertisement in the New York Times offering a reward for the return of the enamels. He also made it known *448 in the antique trade that he was willing to pay a reward for the return of the collection.
Thereafter, an individual called the plaintiff and said that he had heard of the offer circulated in the antique trade and that he would be willing to return the collection for a reward "in the nature of something like $150,000.” Following further negotiations, plaintiff met and paid the caller $71,000, in exchange for which all but 19 pieces of his collection was returned. On cross-examination, he admitted knowing the name of the go-between, but that he was in mortal fear of revealing it and thus declined to do so.[1] On redirect, plaintiff stated that his refusal was based on threats communicated to him to the effect that "I would be killed gangland style” and that "before this was accomplished, [I would] have the privilege to see my older daughter walk with a cane and seeing eye dog, and no amount of operations would restore my wife’s face.”[2]
David Keller corroborated plaintiff’s testimony and likewise refused to identify the intermediary on cross-examination.
The jury was subsequently charged that:
"If you find that the Plaintiff paid a reward of $71,000.00 and that such payment was reasonable in light of the fair market value of the items that he recovered, and you find that the Defendant is liable to the Plaintiff on the cause of action on the bailment, he may recover such sum from the Defend *449 ant. Of course, if you decide against the Plaintiff, on the bailment cause of action, the Plaintiff cannot recover on this second cause of action for the recovery of the reward paid.
"You will recall that the Plaintiff would not divulge the name of the person to whom he claims the money was paid, and he explained the reason. He also said that he paid the money in cash and that none of this was reported to any law enforcement agency. These are all matters for you to consider.
"They are not matters that bar the recovery, they are matters that go to credibility, that is, the weight, you wish to give to this witness’ testimony. It is for you to determine who and what to believe. In this law suit, it is incumbent upon the Plaintiff to establish each item of this case by a fair preponderance of the credible evidence. Until you are satisfied, as reasonable men, that the evidence has fairly and reasonably established the facts asserted by the Plaintiff, he has not sustained that burden of proof.”
Defense counsel took no exception to this portion of the charge and, as stated, the jury found in favor of plaintiff.
In this connection, we would note that defendant did not disagree with the theory upon which the case was to be determined by the jury. In fact, by his failure to except to the charge, defendant consented to and impliedly agreed with the trial court’s determination that the only importance to be attached to plaintiff’s declination to reveal the name of the intermediary related only to the credibility of his testimony. Thus, defendant consented to the law to be applied in the case (Martin v City of Cohoes, 37 NY2d 162, 165-166, and the authorities cited therein). The jury having determined credibility in plaintiff’s favor, the issue now raised by defendant ought not be reviewed.
As a matter of some significance it should be further noted that defendant never, adequately or otherwise, preserved any objection to the testimony of the plaintiff or the witness Keller, which in any way related to the nondisclosure of the intermediary’s identity. Defendants’ position in this regard and any request for sanctions against the plaintiff because of his refusal to reveal the identity, all took place in an in-chambers conference and, of course, away from the public eye of the courtroom and the jury. At that conference, when it was ascertained that disclosure could not be made, counsel for defendant (at the same conference) then requested "that the allegations contained in the provisions of the complaint relat *450 ing to the ransom must be dismissed and stricken, in view of Mr. Kraut’s refusal to co-operate with the Court and with the Defendants”. In denying the application, the Trial Judge again ruled that the question of disclosure was a matter of credibility for the jury and indicated that counsel could renew his motion at the end of the case. No exception was taken to this ruling and, significantly, the application was not thereafter made or renewed. In fact no objection was thereafter made to the testimony of the plaintiff or Keller relating to the nondisclosure of the identity of the intermediary. In all these circumstances defendant must be held to have waived any objection to such testimony of these witnesses (Pendarvis v Farmer Shell Serv. Sta., 37 NY2d 718, affg on the mem thereat 43 AD2d 957; cf. Knoblach v Royal Globe Ins. Co, 38 NY2d 471; Brady v Nally, 151 NY 258, 263-266; see, also, 8 Carmody-Wait 2d, NY Practice, § 56:128 et seq.; 4 Weinstein-Korn-Miller, NY Civ Prac, pars 4017.05-4017.09).
A majority of the Appellate Division were of the view that although full disclosure is generally required of litigants in civil cases, under the exceptional circumstances of this case, a failure to disclose was properly made a matter of credibility for the jury. The dissenters stated that a plaintiff who seeks the aid of the courts must be prepared to disclose any material facts respecting his claim or forego it. We affirm.
This case bears a striking resemblance to Jones v Morgan (90 NY 4) which, we think, is sound and should be considered controlling. In that case, Morgan, a commercial bailee, agreed to store and guard Mrs. Jones’ furniture. The furniture was thereafter stolen and Jones sought to recover the loss from Morgan. The trial record reveals that plaintiff’s husband testified, over strenuous objection, that he purchased some of the stolen property "from a thief through a detective; that was the only way I could get it”. This court unanimously held that when defendant failed to redeliver plaintiff’s property upon demand, he "became liable for the whole of it. What she did, therefore, to recover the property, so far as it was successful, was for [defendant’s] benefit and he was entitled to a credit for the property thus recovered, less the expense of recovering it” (90 NY, at p 12; emphasis added).
The case at bar would be precisely the same had plaintiff hired a detective to do what he himself did—bargain with the thief to reacquire his own property. The distinction is obviously insignificant and thus we hold, as we did in Jones, that *451 a commercial bailee has no right to complain that instead of being charged for the whole loss, it is only being charged with the expense of recovering the goods.
We are urged to find, however, that plaintiff’s failure to identify the intermediary was fatal to his cause in that it seriously prejudiced defendant’s ability to controvert the allegations in the complaint. Apart from the fact that defendant did not properly preserve this issue for our review by objecting to the admission of plaintiffs or David Keller’s testimony or by excepting to the relevant portions of the charge, we see no merit to the claim since defendant has not sufficiently demonstrated that it was prejudiced. The identity of the intermediary bears no relation whatsoever to defendant’s liability which, of course, is founded on the nonreturn of bailed goods, a matter which defendant does not here deny; and, insofar as disclosure is related to the scope of damages, defendant has not shown, and, indeed, on argument, counsel could not state, what use would have been made of the intermediary’s name had it been disclosed. Thus, defendant has not substantiated its claim of prejudice.
We do not intend to imply, however, that a party may always be excused from naming the thief with whom he dealt or that where a plaintiff refuses to disclose relevant information because he claims to have been threatened, that his testimony should automatically be credited. Rather, we simply hold that, under the exceptional circumstances which obtained here, the trial court, in its discretion, could properly have admitted the testimony and submitted the issue of its credibility to the jury.
The dissenters below and those in this court would have us conclude that any action to recover a sum of money paid to a thief, or his agent, for the return of property to the rightful owner is violative of public policy and cannot be maintained. In short, they would overrule Jones v Morgan (90 NY 4, supra) and deny plaintiff a remedy on policy grounds despite the fact (1) that defendant was clearly and concededly negligent and culpable, (2) that plaintiff’s actions mitigated defendant’s possible liability from $731,000 to $71,000 and (3) that plaintiff candidly admitted recovering his own property and dealing with the intermediary.
We cannot agree with this unwarranted stretching of the public policy doctrine. Although "public policy” is a vague term, it "is to be ascertained by reference to the laws and legal "precedents and not from general considerations of sup *452 posed public interests” (Muschany v United States, 324 US 49, 66). In a concise definition, thrice reiterated by this court (Glaser v Glaser, 276 NY 296, 302; Mertz v Mertz, 271 NY 466, 472; Straus & Co. v Canadian Pacific Ry. Co., 254 NY 407, 413), we have said that "when we speak of the public policy of the state, we mean the law of the state, whether found in the Constitution, the statutes or judicial records” (People v Hawkins, 157 NY 1, 12). The rule cannot be otherwise for, as was long ago recognized, when courts attempt to define the limits of public policy without a firm foundation in precedent or law, they usurp the legislative function which is, of course, to define the public will (Cross v United States Trust Co. of N. Y., 131 NY 330, 343-344; Vidal v Girard’s Executor’s, 2 How [43 US] 127).
We have not been referred to, and research has not disclosed, any constitutional rule, legislative enactment or court decision which supports the proffered doctrine of public policy. We are content, therefore, to rely upon engrained and well-founded precedent which requires us to decide the issues at bar and avoid a subjective search to establish a new, unique and novel policy for the State. As the ever eloquent Judge Cardozo put it, courts should be "slow to substitute their own varying views of policy for those which have found embodiment in settled institutions, in every-day beliefs and practices, which have taken root and flourished” (Messersmith v American Fid. Co., 232 NY 161,164-165).
In sum, defendant, whose conceded negligence created plaintiff’s predicament and caused him, his family and friend to suffer great anguish and distress and who, despite plaintiff’s voluntary action mitigating its possible liability from $731,000 to $71,000, now seeks on the basis of an unpreserved objection to a tangential issue to be absolved of any liability whatsoever. On no view of this record or any extraneous public policy considerations is such injustice required in this case.
Accordingly, the order of the Appellate Division should be affirmed.

. Plaintiff also declined to identify the intermediary in the chambers of the Trial Judge even though it was indicated that he would not be asked to publicly state his name, and even though the Judge cautioned plaintiff that: "[I]f you don’t want to divulge the name, then on cross examination they are going to question you to a great extent on this. That would make it, I should think, make it very difficult for the jury to believe that you gave that amount of money, and then refused to name the person to whom you gave it, so I want you to understand the whole situation. Now, if you didn’t have that reimbursement cause of action, then nobody would say a word or care who you gave the money to, but when you ask somebody to give you back $71,000.00, that you paid out, you must recognize the fact that they are entitled to know who you paid it to.”

. In the chambers of the court, plaintiff similarly expressed his fears and added: "[W]e have lived with this horror for three and a half years. On Thursday I went home and I told my wife and children that we had gotten to the point where the name came up. My children said to me, 'Dad, Dad, Daddy, Daddy, please don’t tell them. Please don’t tell them.’ They are mortally afraid. Since this occurrence, your Honor, because of her fear for my, her children, my wife has suffered a nervous breakdown. I can’t tell you any more than that. I just can’t lay their lives on the line anymore. We were a normal family before this happened. None of us are the same any more.”