**OSTANO COMMERZANSTALT and Dr. Herbert Jovy, Plaintiffs,**

v.

**TELEWIDE SYSTEMS, INC. and Bernard L. Schubert, Defendants.**

**No. 82 Civ. 4721 (RLC).**

United States District Court, S.D. New York.

March 2, 1988.

As Corrected April 21, 1988.

Walter, Conston & Schurtman, P.C., New York City, for plaintiffs; William M. Barron, James R. Maxeiner, of counsel.

Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, for defendants; Allan R. Freedman, Mark P. Weingarten, Helen A. Salichs, of counsel.

ROBERT L. CARTER, District Judge.

Plaintiff Ostano Commerzanstalt ("Ostano") is a Liechtenstein company. Pursuant to a power of attorney, plaintiff, Dr. Herbert Jovy, a citizen and resident of West Germany, has acted on behalf of Ostano and its affiliate, TSC Technische Systeme Consult GmbH & Co. Communication International KG ("TSC") in this lawsuit. Ostano is owned by Jovy's wife, and TSC is

owned by Jovy's wife and son, Hanns–Arndt Jovy, who is TSC's general manager. In 1980 Ostano sub-licensed all rights for the films at issue in the German–speaking countries. In 1983 Ostano assigned to TSC the rights to the films in the rest of the territories covered by the Telewide license and all rights and claims in connection with the matters involved here.

Defendant, Telewide Systems, Inc., ("Telewide") is a Delaware corporation with its principal place of business in New York City. Defendant, Bernard L. Schubert, is the president and sole shareholder of Telewide, and the latter's only office is and has been Schubert's home residence at 118 East 65th Street, New York, New York.

Telewide was found liable to plaintiffs for fraud and breach of contract and Schubert was found liable for fraud after trial in 1985. See *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 608 F.Supp. 1359 (S.D.N.Y.1985) (Carter, J.), with which familiarity is assumed. The Court of Appeals affirmed all adjudications as to liability but reversed and remanded for further consideration of damages. *See* 794 F.2d 763 (2d Cir.1986). A hearing on the remand was held on October 14, 15, 16 and 21, 1986. At that hearing, Hanns–Arndt Jovy and Dr. Peter Sczygiol, program acquisition executive and director of Axel Springer, testified for plaintiffs. Mr. Laurence Gershman, a former head of MGM's foreign distribution division, testified for defendants.

At the close of the hearing, plaintiffs moved to add TSC as a named party plaintiff. Defendants moved for sanctions against plaintiffs for failure to disclose in a timely fashion Ostano's assignment of all rights to Telewide film and all rights and claims in this action to TSC.

In its 1985 decision the court awarded to the plaintiffs $3,750,000 in compensatory damages, which amount it found to be the value of the license of the Telewide films in Austria, Belgium, France, the two Germanies, Luxembourg, the Netherlands and Switzerland, plus $512,021.75 which plaintiff had paid for the license and prejudg-

ment interest. Five hundred thousand dollars in punitive damages was also awarded, and plaintiffs were found entitled to an award of attorneys' fees on appropriate submissions by counsel.

The Court of Appeals held that plaintiffs' damage award on their fraud claim against Schubert and Telewide was limited under New York law solely to out-of-pocket losses. *See* 794 F.2d at 766–67. The Court held that plaintiffs were entitled to benefit-of-the bargain damages on their breach-of-contract claim against Telewide. The Court did not agree, however, with the method used to calculate those damages, and it held that plaintiffs were not entitled to recover $512,021.75 paid for the license as part of their damages. Finally, the Court remanded for clarification of the punitive damages award because the court's opinion seemed to assess punitive damages in part on the basis of defendants' bad-faith conduct during the litigation. The Court of Appeals held that under New York law punitive damages are permissible only if based upon "the deliberate and willful nature of the fraud and misrepresentation." 794 F.2d at 768.

Based on evidence adduced at the remand hearing, and on instructions issued by the Court of Appeals concerning the appropriate yardsticks for awarding compensatory damages for fraud and breach of contract and for punitive damages, I will attempt to reconstruct the damage awards. Attorneys' fee submissions have been filed, and an award of attorneys' fees will also be made.

At the four-day hearing, plaintiffs presented evidence of prices paid in Europe for films to be shown on television, evidence of expenses incurred and revenues received by plaintiffs in seeking to license the Telewide films, and the value of the Telewide films placed by a Springer AG representative who had personally negotiated with Herbert Jovy and Tishwasky to purchase the rights to license for ten years some of the Telewide films in seven countries. Defendants' evidence concerning the pricing of films for TV showing in Europe

was only marginally at variance with plaintiffs' evidence.

The evidence from the testimony of the live witnesses, Jovy, Gershman and Sczygiol, and from Variety and TV World, acknowledged as authorities on rating and pricing films with respect to West Germany, follows: $50,000–$59,000 (Variety PX 103–108),[1] $50,000–$75,000 (TV World PX 109), $63,000 (Jovy Tr. 18)[2] $60,000–$75,000 (Gershman 327, 403–404), $126,000–$189,000 for all seven countries (Sezygiol 542). These prices were subject to a negotiated 15 percent discount if a group of films was bought. In East Germany, the range was $6,000–$10,100 (Variety and TV World). No prices were given for this area by Jovy, Sczygiol or Gershman. In Austria, the price per film was $2,700–$5,000 (Variety), $2,750–$5,000 (TV World), $7,500 (Jovy Tr. 422); in Switzerland, $4,000–$9,000 (Variety and TV World), $6,000 (Jovy Tr. 44); in Belgium, $5,100–$21,000 (Variety), $4,000–$5,000 (Jovy Tr. 46), $4,000–$5,000 (Gershman Tr. 344); in France, $30,000–$40,000 (Variety), $30,000–$50,000 (TV World), $40,000–$45,000 (Gershman Tr. 342–43); in Luxembourg, $5,000–$6,000 (Variety and TV World), $5,000 (Jovy Tr. 44), $50,000–$60,000 (Gershman Tr. 345); and in the Netherlands $75,000–$85,000 (Variety and TV World), $40,000–$60,000 (Gershman Tr. 348).

Sczygiol negotiated for the purchase of nine Telewide films at $126,000 and "Blue Gardenia" at $189,000 with a negotiated 15 percent discount if the purchases were part of a package. Thus, the price in the territory ranged from $105,700 to $189,000 per film for all the countries involved. This means the 26 films were valued at $2,748,200 to $4,862,000, averaging $3,831,000 for the 26–film package.

Helmut Hoffman, a former employee of a German film-buying entity, also testified for defendants, but his testimony was of no help to the court since he had never dealt with the purchase of feature films.

Dr. Peter Sczygiol, a witness for plaintiffs, works for the publishing house, Axel Springer, as its program acquisition executive director. He evaluates and purchases TV programs for sale and distribution by Springer (Tr. 492). He examined Exhibit 115 which he had evaluated in 1980. He did not buy films listed in Ex 115 because rights to them could not be guaranteed at the time (Tr. 498). He already had rights to "Lucky To Be A Woman" (Tr. 499). He advised Jovy that he would not buy films unless the distribution rights were guaranteed (Tr. 501), and no proof to that effect was provided (Tr. 502). Dr. Jovy advised Sczygiol in June, 1981, that he would be going to the United States shortly to clear the matter up (Tr. 502). Sczygiol negotiated with Jovy and Tishwasky to acquire feature films for Springer (Tr. 503–504). He sought feature films with distribution rights in Germany, Austria, German-speaking Switzerland, France, the Benelux countries (Belgium and Luxembourg (Tr. 507)) and Holland (Tr. 506). He sought a license for ten years (Tr. 508) and discussed 300 films (Tr. 509). Exhibit 126 is a summary of films, licenses and tentative prices (Tr. 510). He also made tentative price notations on Exhibit 115 in discussions with Jovy and Tishwasky (Tr. 510). He prepared Ex. 126 (Tr. 510) and was authorized to negotiate all conditions of a contract for buying feature films for TV showing in the seven countries and to present to Springer a final contract for its approval (Tr. 514). Among the Telewide films, he selected twenty-one films including "Big Tip Off", "Girl of the Night", "Night Freight", "Port of Hell", "Port of New York", "San Francisco Story", "Sword of Venus", "Trapped", and "Treasury of Ruby Hills" (Tr. 515). These films were tentatively agreed on at a price of $126,000 per film (Tr. 515). Two films were negotiated for $189,000; one was "Blue Gardenia" (Tr. 515, 526). He conversed with Tishwasky and Jovy about "Lucky To Be A Woman" and "Shanghai Gesture" and was prepared to come to a special price for these films,

---

**1.** The PX refers to Plaintiffs' Exhibits.

**2.** This reference is to the transcript of the remand hearing.

after checking the license and material in question (Tr. 516). He valued "Big Tip Off" at $126,000 for video satellite and TV rights in seven countries for ten years (Tr. 521) and $126,000 for each of twenty-one films (Tr. 524). He discussed films he could not evaluate because he needed more information about the film's content, cast, director, and whether it had already been distributed in Germany. These included "Devil's Harbor", "The Fighter", "Gilded Cage", and "Impulse" (Tr. 525–528). Nine Telewide films, "Blue Gardenia", "Lucky To Be A Woman" and "Shanghai Gesture", were evaluated (Tr. 528–29). He requested of Jovy a guarantee of rights and prints (Tr. 529–30), and he needed laboratory access (Tr. 531). He was prepared to negotiate a contract on behalf of Springer for less than all the films on Exhibit 126, subject to Board approval (Tr. 533). If the rights problem had been satisfied after June 22, 1981, he would have proposed to Springer the purchase of nine Telewide films at $126,000 each (Tr. 533–35), minus 15 percent (Tr. 536). He would have paid $189,000 for "Blue Gardenia" (Tr. 535). Jovy could not license and did not price "Shanghai Gesture" (Tr. 536); ZDF paid DM 126,000 for feature films. Sczygiol, however, negotiated for $126,000 per film. However, ZDF films were licensed only in Germany for four to five years. He was negotiating for a license in seven countries for ten years, and sought a license to embrace TV, video and satellite rights (Tr. 542–43). On the final meeting with Jovy, Sczygiol told him that he had a specific interest in certain films but could not proceed further until the rights issue and access materials questions were clarified. (Tr. 587).

## DETERMINATION

Initially, the motion to add TSC as a named party plaintiff is granted.

Schubert persistently represented that Telewide owned those distribution rights in the seven countries constituting the area of interest to plaintiffs, although he knew that Telewide held no such rights and that he would not provide Jovy with promised documentary proof of such purported ownership rights. He also promised access letter to preprint materials, when he did not and indeed had no supply of this material.

■ Plaintiffs are entitled to recover benefit-of-the bargain damages on their breach of contract and warranty claims against Telewide. The victim is entitled to the benefit of his bargain, including profits he would have received if there had been no breach. *Sager v. Friedman*, 270 N.Y. 472, 481, 1 N.E.2d 971 (1936). The benefit to be awarded must have a solid basis and constitute a reasonable estimate of the value of the bargain. *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383, 357 N.Y.S.2d 857, 861, 314 N.E.2d 419, 421 (1974); *Lexington Products Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251, 253–54 (2d Cir.1982) (while certainty in damage calculation is not required, a rational basis, however, for the calculation is mandatory).

The Telewide films were bought under the representation that plaintiffs were receiving the exclusive right to rent, sell, distribute and otherwise exploit the 26 Telewide films in the two Germanies, Austria, Switzerland, Holland, Luxembourg, Belgium and France ("the territory").

The benefit-of-the bargain damages should encompass the value of what plaintiffs could reasonably have expected to obtain monetarily in having an exclusive license to commercially exploit the 26 Telewide films in the territory. As was pointed out in the earlier opinions, no contracts were actually concluded other than those reached in licensing several of the films to small broadcasters. However, plaintiffs were clearly going to utilize their right to these films to license major TV broadcasters to air these films on TV and to license their satellite rights to them for a period of years.

Plaintiffs are entitled to the value of the license they thought they had bought from Schubert and Telewide. The value of the right to license the 26 films in the territory ranged, as indicated, from $2,748,200 to $4,862,000, averaging $3,831,000 for the 26–film package. Plaintiffs made several sales of prints of the films to small broadcasters and obtained net revenues of some

$177,549.09. Taking $3,831,000, the average, as the value to be placed on the right plaintiffs contracted for in the territory, minus revenues earned, leaves a benefit-of-the bargain damage claim of $3,653,550.91 as established. Plaintiffs are entitled to judgment against Telewide in that amount, plus prejudgment interest from May. 13, 1980.

Out-of-pocket expenses embrace "the costs incurred ... in preparation or in performance or in passing up other business opportunities," *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 793 n. 6 (2d Cir.1986), as well as costs incurred in reasonable attempts to mitigate damages. *Lanite Sales Co. v. Klevins Corp.*, 205 Misc. 303, 128 N.Y.S.2d 182, 188 (Sup. Ct.1954). Out-of-pocket expenses also cover "other consequential damages proximately caused by reliance upon the misrepresentation." *Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 453 N.Y.S.2d 750, 755 (2d Dep't 1982). Such damages include expenses reasonably incurred by the victim which would not have been incurred had there been no fraud. Thus costs incurred in an attempt to achieve the transaction's objectives constitute covered expenses. *See Mills Studio, Inc. v. Chenango Valley Realty Corp.*, 15 A.D.2d 138, 221 N.Y.S.2d 684 (3d Dep't 1961).

■ Accordingly, here Ostano and TSC are entitled to recover the consideration paid for the fraudulent license (Tr. 512, 021) and all reasonable expenses incident to any attempts to market the films less any revenues earned in the process. Although frustrated in its attempt to secure from Schubert documentary proof of Telewide's right to license the films in the territories and laboratory access letter to obtain obligatory prints and preprint materials to market the films, plaintiffs did obtain a print of some of the films from Cinelab and access to a German version of "Blue Gardenia" (Tr. 112–13). Sales were made to small distributors.

Plaintiffs' exhibit 119 consists of 48 items of expenses incurred in the effort to market the Telewide films. These expenses include the purchase of single prints, preparation of magnetic tracks, regimentation of films, production of cassette and dubbed versions, shipping, telephone and customs costs. Hanns–Arndt Jovy made four business trips in connection with Telewide licenses. These expenses are documented in PX 121. PX 120 and PX 122 summarize these expenses. PX 120 shows some TSC expenses documented in PX 119 in Deutschemarks and dollars listed are DM 124,602.64 or, using an exchange rate of $.50 per each DM $62,301.32 and $15,-894.84 in dollar expenses for a total of $78,196.16. Travel expenses shown on PX 122 were DM 18,098.54 or $9,049.27, for a total of $87,245.43 for all expenses. This figure, when added to the $512,021.75 for the license, totals $599,267.18 in moneys spent by TSC. Revenues received from these endeavors were $264,794.52, leaving net recoverable out-of-pocket expenses of $334,472.66. Thus, plaintiffs are entitled to recover from Schubert on their fraud claims $334,472.66, constituting their out-of-pocket expenses, plus prejudgment interest of 9% on the $87,245.43 component amount from January 1, 1985, to date of entry of judgment, and prejudgment interest of 9% on the remaining amount from May 13, 1980, to date of entry of judgment.

■ On the issue of punitive damages, the Court of Appeals remanded the matter for clarification. Plaintiffs are entitled to punitive damages because Schubert entered this transaction from the outset with a clear and blatant intent to defraud. The demeanor and acts of the defendant at trial may be considered "as bearing on whether there is a need for punishment of the defendants and deterrence of like conduct by others who may be in similar circumstances in the future." *Hall v. Ochs*, 623 F.Supp. 367, 377 (D.Mass.1985), *aff'd in part and rev'd in part*, 817 F.2d 920 (1st Cir.1987). All circumstances immediately connected to the transactions tending to exhibit or explain motive are relevant to a punitive damages determination. *Le Mistral, Inc. v. Columbia Broadcasting System*, 61 A.D.2d 491, 402 N.Y.S.2d 815, 817–18 n. 2 (1st Dep't. 1978). The conduct at trial

makes clear the deliberate, premeditated nature of the fraud perpetrated on plaintiffs. Punitive damages in the sum of $500,000 are awarded against Schubert.

Counsel has submitted an affidavit showing that plaintiffs have incurred some $153,007 through the post-trial proceedings, with some 1,480.1 hours being spent by counsel on this case. The bulk of the time (548.6 hours) was spent by William Barron, trial counsel, whose hourly rate is $185. The hourly rate charged in this case ranged from $185 for Mr. Barron to $40 for paralegal services.

The affidavit is sufficient in detail. Accordingly, plaintiffs are awarded $153,087 in attorneys' fees against Schubert, Telewide and the defendants' attorneys, the firm of Hall, Dickler, Lawler, Kent & Friedman, jointly and severally.

Plaintiffs are entitled to prejudgment interest of 9 percent on the award of actual damages from May 13, 1980 to date of judgment.

IT IS SO ORDERED.