**GORDON & CO., Plaintiff–Appellant,**

v.

**Arthur H. ROSS, Defendant–Appellee.**

**No. 1625, Docket 94–9205.**

United States Court of Appeals,
Second Circuit.

Argued June 28, 1995.

Decided May 17, 1996.

Square Securities Group, Inc. ("Hanover"). The judgment was based in part upon a grant of summary judgment in Ross's favor and in part upon a verdict in Ross's favor following a bench trial before Magistrate Judge Gershon. We vacate and remand to the district court for further proceedings.

At all times relevant to this action, Gordon was a broker-dealer in publicly traded securities. Its principal business was selling put and call options. If a customer exercised an option before it expired, Gordon would sell to the customer (in the case of a call) or buy from the customer (in the case of a put) a specified number of shares of a particular stock at a set price. Gordon hedged itself in these transactions by creating a margin account which held covering securities. Gordon financed its securities purchases in part by borrowing from the brokerage firm in which its margin account was maintained.

Hanover was Gordon's principal clearing broker for executing Gordon's trades on the New York Stock Exchange, and Gordon maintained a margin account with Hanover. On October 21, 1983, Gordon had securities worth approximately $13 million in this account, with a debit balance representing its borrowings against these securities in the approximate amount of $4.7 million.

On Monday, October 17, 1983, the New York Stock Exchange informed Hanover's principals that their brokerage business would be closed on Friday, October 21st unless they raised substantial capital, stopped hypothecating fully-paid securities and corrected shoddy bookkeeping practices. On the 21st, Gordon learned of Hanover's problems and attempted without success to withdraw $4.5 million from its margin account, which was the amount in excess of that needed to satisfy margin requirements. Instead of receiving the money, Gordon was asked to meet over the weekend with representatives of Hanover and other securities brokers who dealt with Hanover to explore the possibility of raising sufficient capital for Hanover to permit it to open its business on Monday, October 24th.

In the course of these meetings, Gordon agreed to loan Hanover $1,950,000 by increasing its debit balance to Hanover in this

Steven L. Herrick, Garden City, NY, for Plaintiff–Appellant.

Jack David, New York City (Steven Finell, New York City, of counsel), for Defendant–Appellee.

Before: VAN GRAAFEILAND, JACOBS and LEVAL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Gordon & Co. ("Gordon") appeals from a judgment of the United States District Court for the Southern District of New York (Gershon, M.J.) dismissing Gordon's complaint alleging fraud against Arthur H. Ross, the former Chief Executive Officer of Hanover

amount. To induce the making of this loan, Hanover representatives, including Ross, promised that, if the New York Stock Exchange permitted Hanover to open on the 24th, all of Gordon's securities in Hanover's margin account would be delivered on that day to Bear Sterns, Gordon's designee, upon Gordon's payment to Hanover of the debit balance in its Hanover account. To satisfy Gordon that this transfer was possible, Ross represented that none of Gordon's fully-paid securities in its margin account with Hanover had been hypothecated by Hanover to secure repayment of any borrowings that Hanover had made.

Hanover was permitted to open for business on October 24th, but did not transfer Gordon's securities, as it had promised to do. It began the transfers on October 26th, but ultimately failed to deliver $1,890,796 of fully-paid securities because, contrary to Ross's representations, it had hypothecated these securities to two banks to secure $1,034,347 in loans from the banks. In order to recover its $1,890,796 in securities, Gordon loaned Hanover an additional $1,034,347 with which to pay its bank indebtedness. On December 8, 1983, Hanover was forced to liquidate. Not surprisingly, neither loan was repaid.

In 1987, Gordon commenced this action in New York Supreme Court alleging that the fraudulent misrepresentations by Ross led to the making of both loans. After the action was removed to the Southern District of New York, it was referred by stipulation to Magistrate Judge Gershon for disposition pursuant to 28 U.S.C. § 636(c). Magistrate Judge Gershon rejected Gordon's claim based on the second loan by granting Ross's motion for summary judgment directed to that cause of action. Thereafter, she conducted a bench trial of Gordon's claim respecting the first loan, and, at the conclusion thereof, held in favor of Ross.

In the course of these proceedings, Magistrate Judge Gershon made a number of factual findings that have full support in the record. She found that Ross misrepresented that, if Gordon made the $1,950,000 loan, all of the over $13 million of Gordon's securities held by Hanover would be delivered to Gordon on October 24th, against payment by Gordon of its debit balance of approximately $4.7 million. She found that Ross also misrepresented that none of Gordon's fully-paid securities had been hypothecated for loans to Hanover, and that these misrepresentations were deliberate and material. She found that, as of November 4, 1983, Gordon could not obtain delivery of $1,890,796 of its fully-paid securities because Hanover had hypothecated them to secure loans from the two banks, and as a result, Gordon was required to pay off Hanover's loans from the two banks in the amount of $1,034,347 to free the hypothecated securities.

Gordon seeks recovery of the balance owing on both the $1,950,000 loan ("Loan # 1") and the $1,034,347 loan ("Loan # 2"). Because the issues with respect to the two loans are not identical, we discuss them separately.

### Loan # 1

■ In denying Gordon recovery on Loan # 1, the magistrate judge focussed on the fact that Gordon's wrongfully hypothecated stock eventually was transferred to Gordon's designee. She said that "even if Ross's statements had been true, and all of Gordon & Co.'s securities had been delivered on October 24, 1983, the $1,950,000 loan would still have been outstanding." This may be an interesting hypothetical, but it is not the issue in the case. Ross's statements were not true, and the starting point for determination is whether the untrue statements induced Gordon to make the $1,950,000 loan. If they did, the issue of Ross's liability hinges upon the relationship between Ross's fraudulent statements and Gordon's loss. In analyzing this relationship, it was important that the trial judge follow the law of New York. In New York, "[a] cause of action for fraud may arise when one misrepresents a material fact, knowing it is false, which another relies on to its injury." *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 1014, 653 N.E.2d 1179, 1184 (1995); *see also Barclay Arms, Inc. v. Barclay Arms Assocs.,* 74 N.Y.2d 644, 646–47, 542 N.Y.S.2d 512, 514, 540 N.E.2d 707, 709 (1989) (no fraud where, *inter alia,* plaintiff did not rely on misrepresentation); *Orbit Holding Corp. v. Anthony Hotel Corp.,* 121

A.D.2d 311, 314, 503 N.Y.S.2d 780, 782 (1986) (final element of fraud is showing "that the party to whom the representation was made relied upon it to its injury or damage").

In *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958), the Court, citing 3 Restatement, Torts, § 525, at 59, said:

> Accordingly, one "who fraudulently makes a misrepresentation of * * * intention * * * for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction" is liable for the harm caused by the other's justifiable reliance upon the misrepresentation.

Sections 546 and 548A of the *Restatement (Second) of Torts* also emphasize the importance of reliance:

> § 546.   Causation in Fact
>
> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss.
>
> § 548A   Legal Causation of Pecuniary Loss
>
> A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance.

▉▉▉  Obviously then, in New York, as in any other state whose common law accords with the view of the *Restatement*, liability is determined by whether the plaintiff justifiably relied upon the defendant's misrepresentations and suffered a loss that reasonably might have been anticipated to result from the reliance. *See Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 20–21 (2d Cir.1986), *cert. denied sub nom.* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 708 (2d Cir.), *cert. denied sub nom.* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980).

Gordon's claim of recoverable damage with regard to Loan #1 is not based upon the difficulties it encountered in securing the return of its wrongfully hypothecated securities. It is based on the contention that Gordon would not have made the loan if Ross had not deceived it concerning Hanover's stock machinations. In paragraph 21 of Gordon's amended complaint, it alleged that "[t]o induce plaintiff to close and consummate the Cash Subordination Agreement," (the $1,950,000 loan) Ross represented that Hanover would promptly return Gordon's securities. In paragraph 25, Gordon alleged that it relied upon this representation "by consummating and closing" the Cash Subordination Agreement. In paragraph 26, Gordon alleged that no part of the subordinated loan had been repaid except $31,145.34 in interest.

We believe that if New York law is properly applied, the issue for determination is whether Gordon justifiably relied upon Ross's misrepresentations in making the $1,950,000 loan and whether the loss sustained by Gordon might reasonably have been anticipated by Ross. We note that this is not a case where a victim is fraudulently induced to advance money to a company that becomes insolvent several years later from unrelated causes. *Cf. Citibank N.A. v. K–H Corp.*, 968 F.2d 1489 (2d Cir.1992). Hanover was teetering on insolvency when Gordon's fraudulently induced loan was made. No one knew this better than did Ross. Upon remand, the trier of fact will have to decide whether Ross, after fraudulently securing $1,950,000 from Gordon to save the sinking ship, may validly contend that Gordon's loss was attributable only to the sinking of the ship and was not a reasonably foreseeable result of the fraud.

### Loan #2

In discussing the second loan, the magistrate judge said:

> Plaintiff established that, as of November 4, 1983, Gordon & Co. could not obtain delivery of $1,800,000 of its fully paid securities held by Hanover because Hanover had hypothecated them to secure loans to Hanover. As a result, Gordon & Co. was required to pay off Hanover's loans to

those two banks, in an amount totalling $1,034,347.

Magistrate Judge's Second Opinion at 10.

The magistrate judge nevertheless summarily denied Gordon's claim for recovery of the $1,034,347, stating her reason as follows:

It is undisputed that, by the time of this second loan, Gordon & Co. knew both that the $13,000,000 worth of securities had not been fully returned to it and that Hanover had hypothecated $1,800,000 worth of securities to two banks for loans made to Hanover. Thus, Gordon & Co. could not have reasonably relied upon the alleged misrepresentations as to delivery of the securities and the absence of hypothecation in making the second loan. Since the plaintiff cannot establish that there is a fact issue as to reasonable reliance, these counts must be dismissed.

Magistrate Judge's First Opinion at 16.

■ Here, the magistrate judge erred, not once, but twice. The proper test of reliance in a fraud case is not "reasonable" reliance, it is "justifiable" reliance, a clearly less burdensome test. *See Field v. Mans,* —— U.S. ——, ——————, 116 S.Ct. 437, 443–446, 133 L.Ed.2d 351 (1995); *Corva v. United Serv. Automobile Ass'n,* 108 A.D.2d 631, 632, 485 N.Y.S.2d 264 (1985) (mem.).

■ Secondly, in looking for the requisite reliance, the magistrate judge looked in the wrong place. The reliance that put Gordon in the position where, as the magistrate judge found, it was "required" to expend an additional $1,034,347 to secure the return of its securities was the reliance that induced Gordon to make the initial loan of $1,950,000. After making this loan in reliance on Ross's false representation that the loan would free all of Gordon's securities, Gordon found that $1,890,796 of its securities had been hypothecated and would not be returned unless Gordon came up with another $1,034,347. Thus, once Gordon had relied on Ross's false assurance of non-hypothecation in extending the loan of $1,950,000, it had no choice but to extend the further loan to secure recovery of a part of the fraudulently induced first loan. We conclude that under these circumstances, the grant of summary judgment in Ross's favor was error, and accordingly vacate the grant and remand for trial.

For the benefit of the trier of fact on remand, we suggest that there are two separate, but somewhat overlapping, lines of New York authority which it should consider. In the case of *Kraut v. Morgan & Brother Manhattan Storage Co.,* 38 N.Y.2d 445, 381 N.Y.S.2d 25, 343 N.E.2d 744 (1976), a quantity of valuable Russian enamels stored by Kraut in defendant's warehouse was stolen. Kraut recovered most of the enamels by paying a ransom to an unidentified intermediary of the thief. A portion of the ransom was included in his verdict against Morgan & Brother. Relying upon the seminal case of *Jones v. Morgan,* 90 N.Y. 4 (1882), the New York Court of Appeals held that the ransom was a proper item of damage as an expense of recovery. In *Jones,* the plaintiff, suing for the loss caused by the theft of her stored furniture, was allowed recovery, not only for the entire value of her unrecovered furniture, but also for the expense of hiring detectives and bringing legal proceedings which aided in the partial recovery.

In the instant case, Ross fraudulently asserted that none of Gordon's fully-paid securities had been hypothecated by Hanover. In order to secure the return of $1,890,796 of its wrongfully hypothecated securities, Gordon "ha[d] to come up with the $1,034,000." (Testimony of Gordon's negotiating attorney Warren Miller). In the light of the above-cited New York cases, the finder of fact might well treat the $1,034,347 as a legitimate expense of the recovery of the $1,890,796 in securities and a proper item of damage.

Another possible theory of recovery is a "natural corollary" of the doctrine of mitigation of damages as expressed in the leading New York case of *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n,* 226 N.Y. 1, 8, 122 N.E. 463 (1919):

Then it is held as a natural corollary to this rule of duty, not only that the injured party who makes a successful effort to avoid or reduce damages will be allowed to recover the expenses necessarily incurred in so doing, but also that he will be allowed

to recover the expenses of a proper effort even though it proves unsuccessful.

*See also Ostano Commerzanstalt v. Telewide Sys., Inc.,* 684 F.Supp. 1172, 1176 (S.D.N.Y. 1988), *aff'd in part, modified in part on other grounds,* 880 F.2d 642 (2d Cir.1989):

> Such damages include expenses reasonably incurred by the victim which would not have been incurred had there been no fraud. Thus costs incurred in an attempt to achieve the transaction's objectives constitute covered expenses.

A finder of fact would be justified in finding that Gordon's expenditure of the additional $1,034,347 was a natural corollary of its attempt to mitigate damages, i.e., $1,034,347 expended to avoid a probable $1,890,796 loss. This was not a claim to be dismissed by summary judgment.

■ We will not prolong this opinion by discussing our dissenting colleague's factual and theoretical arguments made in attempted justification of the magistrate judge's grant of summary judgment. If on the trial that we now direct Ross's counsel believes that one or more of these arguments might receive a favorable response from the trier of fact, counsel will have an opportunity to make them. They may not be made at this time to support a grant of summary judgment, which is appropriate only if there is no genuine issue of material fact and the district court has correctly applied the law. *National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 (2d Cir.1989).

### *Summary*

We do not hold that Gordon is entitled to recover for the loss it sustained on either loan. With regard to Loan # 1, we hold that the magistrate judge did not follow established principles of New York law with respect to fraud. With regard to Loan # 2, we hold that the magistrate judge misapplied the test of reliance and therefore the claim was not properly one for summary disposition. Accordingly, we vacate the judgment below and remand for further proceedings consistent with this opinion.

JACOBS, Circuit Judge, dissenting:

There is no question that Gordon & Co. was the victim of a fraudulent misstatement by Ross. I respectfully dissent, however, because I agree with Magistrate Judge Gershon that Gordon cannot show reasonable and detrimental reliance upon that misstatement in incurring the loss for which it seeks recovery in this action.

### BACKGROUND

At the outset of events, Gordon & Co. had approximately $13 million worth securities in a margin account at Hanover. Gordon had a right to demand that Hanover deliver all the securities in its account, less any debit balance that it owed Hanover. As of October 21, 1983, that debit balance was $4.7 million; so Gordon had a right to immediate delivery of $8.3 million in securities.

On Friday, October 21, Hanover was informed by the New York Stock Exchange ("NYSE") that it would not be permitted to open for business on Monday, October 24 unless it could shore up its finances. Concerned that all its securities in the Hanover account might be lost if Hanover failed, Gordon agreed on October 23 to lend Hanover $1.95 million by increasing the debit balance it owed to Hanover.[1] In turn, Ross (a Hanover principal) agreed on behalf of Hanover that it would return *all* of Gordon's securities on Monday, October 24. Ross also represented that none of Gordon's securities had been hypothecated to third parties. Ross and two other Hanover principals issued personal guarantees on the loan, and agreed to cause the debts that Hanover owed to them to be subordinated to the Gordon loan. In addition, Rooney Pace, Inc. ("RPI"), a brokerage house and creditor of Hanover, tentatively agreed to purchase certain assets of Hanover and to guarantee payment of the Gordon loan. RPI retained the right to rescind the purchase of Hanover's assets.

Hanover opened for business on Monday, October 24. By November 2, Hanover had returned all but $1.8 million of Gordon's fully paid securities. On or about that date, Hanover informed Gordon that the remaining

---

1. Several other clients also extended credit to Hanover.

securities could not be delivered because Hanover had hypothecated them to two banks. As the magistrate judge found, Ross's prior statements to Gordon—that all of Gordon's securities would be returned, and that none of those securities had been hypothecated—were therefore fraudulent.

On November 7, 1983, Gordon agreed to make a second loan to Hanover in the amount of Hanover's $1.034 million indebtedness to the two banks. In exchange for their receipt of that sum, the banks agreed to release their claims on the $1.8 million in securities, which were then delivered to Gordon. In early December, Hanover informed the NYSE about a previously undisclosed loan in the amount of $1.2 million owing to yet another bank. That loan was not recorded in Hanover's books and had been hidden from Ross and the NYSE by one of Ross's fellow principals. Having exhausted the patience of its creditors, Hanover went into liquidation on December 8, 1983, and defaulted on both Gordon loans.

### DISCUSSION

The magistrate judge ruled that Gordon could not recover on the first loan because, even if all of Gordon's securities had been delivered in accordance with Ross's representations, (i) the initial $1.95 million loan would have remained outstanding, and (ii) Hanover would have defaulted on it anyway. As the court expressed it, relying on our decision in *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489 (2d Cir.1992), "the misstatements were not causally related to the repayment of the loan."[2]

The only compensatory damages that Gordon seeks are in respect of the second loan. As to that transaction, the critical juncture is November 2, 1983, and the days immediately following—the time that Gordon learned that Ross's prior representations were materially

false and fraudulent. At that point, Gordon was a creditor on a $1.95 million loan to Hanover, and had failed to recover $1.8 million in securities that Hanover had hypothecated. Gordon had a couple of options:

A. As to the remaining $1.8 million in securities, Gordon could have sought recovery in an action for fraud against Hanover and Ross. As to the first $1.95 million loan, Gordon could have awaited payment and, in the event of Hanover's default, commenced suit on the personal guarantees issued by Ross and his fellow principals, or on the guarantee issued by RPI.[3] In this way, Gordon could have recovered the full value of its securities and the full amount of the first loan to Hanover, without entering into another transaction with its defrauders.

B. Alternatively, Gordon could have struck a deal with the banks directly by paying them the $1.034 million to discharge Hanover's debt upon the condition that Hanover direct the banks to release the $1.8 million in shares to Gordon. (If Gordon had taken this course of action, I might agree with the majority that the transaction would have been a payment in mitigation of damages and recoverable from Hanover and Ross in fraud.) Again, Gordon could have recovered the $1.95 million loan (in the event of default) by way of actions on the guarantees.

But Gordon instead entered into a new transaction with Hanover and Ross and, after Hanover defaulted on its loans from Gordon, commenced this fraud action. In order to recover in fraud, New York law requires, *inter alia*, that the allegedly defrauded party show that it relied to its injury on the fraudulent misstatement. *Graubard Mollen Dan-*

---

2. Although Gordon appeals from that ruling, it seeks a reversal so that a judgment of nominal damages can be entered on remand. *See Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 470, 453 N.Y.S.2d 750, 756 (1982) ("Notwithstanding its failure to establish damages, [a plaintiff] is still entitled to nominal damages to vindicate its rights deriving from the fraud … practiced upon it." (citation omitted)).

3. In fact, Gordon brought actions on the personal guarantees of Les Dubitsky and Laris Milonas, the two other Hanover principals who guaranteed the first loan. Gordon recovered $347,-763.06 in settlement of those actions.

*nett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 1014, 653 N.E.2d 1179, 1184 (1995); *Barclay Arms, Inc. v. Barclay Arms Assocs.,* 74 N.Y.2d 644, 646–47, 542 N.Y.S.2d 512, 514, 540 N.E.2d 707, 709 (1989) (mem.). However, at the time that Gordon entered into the November 7 transaction, Gordon knew that Ross's prior representations were false. The magistrate judge was therefore correct in ruling that Gordon could not have reasonably (or justifiably) relied on Ross's prior misstatements in entering into the November 7 transaction. *See Clearview Concrete,* 88 A.D.2d at 468, 453 N.Y.S.2d at 755 ("With reliance the key element for such recovery, only prediscovery expenses can be recaptured since expenses incurred after discovery have no root in reliance . . . ." (citations omitted)).

The majority holds that, once Gordon learned of Ross's fraudulent misstatement on November 2, 1983, "it was 'required' to expend an additional $1,034,347 to secure the return of its securities." Maj. Op. at 546. But I can think of no circumstance that actually compelled Gordon to lend more money to its defrauders. I have outlined two available alternatives Gordon might have adopted. Gordon chose to forgo those options and instead entered into another transaction the effect of which, in my view, was to abandon by settlement or election any claim for fraud that Gordon might have had against Ross and Hanover. The elements of the November 7, 1983 transaction were as follows:

i. Gordon paid the two banks, on behalf of Hanover, $1.034 million.

ii. The banks delivered the remaining $1.8 million in securities to Gordon.

iii. Hanover delivered a promissory note for $1.034 million to Gordon.

iv. Hanover assigned to Gordon, as security for repayment of the promissory note, Hanover's interest in all cash and securities on deposit at The Depository Trust Company, Midwest Clearing Corp., Midwest Securities Trust Co., National Securities Clear-

ing Corp., and the Options Clearing Corp.[4]

From that point, Gordon could no longer claim that it was fraudulently dispossessed of its securities, because those securities had been returned. Thus, Gordon's fraud claim against Hanover and Ross was implicitly released and forgone in exchange for what Gordon then doubtless considered a more satisfactory arrangement.

Gordon mitigated the risk that its two promissory notes would be discharged in the event of Hanover's bankruptcy by (i) retaining the personal guarantees of Ross and two other Hanover principals on the first (October 23) loan; (ii) retaining RPI's guarantee on the first loan; and (iii) taking an interest in Hanover's deposits with the five depository institutions to secure the second (November 7) loan. Thus, as of November 7, Gordon held guarantees or security interests for each loan.

Gordon then proceeded, for one reason or another, to relinquish each of these guarantees and security interests. For reasons not fully explained in the record, Gordon released Ross from his guarantee of the first loan on November 10, 1983. On November 11, Gordon and Hanover "cancelled, rescinded and revoked" the November 7 promissory note, purportedly at the insistence of the NYSE. On November 14, RPI informed Gordon that it intended to rescind its earlier tentative agreement to purchase the assets of Hanover unless that agreement was modified. Ross, RPI, Gordon, and other creditors of Hanover entered into a modification agreement that, *inter alia,* released RPI's guarantee of the first loan from Gordon to Hanover. Also on that date, Gordon, RPI and Citiwide Securities Corporation (another Hanover creditor) entered into an agreement pursuant to which RPI granted Gordon a security interest in expected profits from certain (formerly) profitable Hanover operations that RPI purchased and agreed to operate. However, Hanover was forced into liquidation before any profits from those operations materialized.

---

**4.** Hanover pledged all cash and securities on deposit at the Depositary Trust Company except for $515,777.

But for Gordon's relinquishment of its guarantees and security interests, the relief sought on the ground of fraud would have been collectible: the first loan would have been recoverable by way of an action on the personal guarantees of Ross, his fellow principals, or perhaps RPI; and the second loan would have been recoverable, at least in part, by way of Gordon's lien on the secured assets in Hanover's accounts at the depository institutions. The cause of the loss which Gordon seeks to recover in this appeal was therefore two-fold: (i) the primary obligor (Hanover) became insolvent, and (ii) the security interests in Hanover's assets held at the depository institutions were released. Moreover, because Gordon had not relied on Ross's misstatements in making the second loan, Gordon cannot recover that loss in an action for fraud.

The majority analogizes Gordon's second loan to a ransom payment, which may be recoverable in an action in contract. *See, e.g., Kraut v. Morgan & Brother Manhattan Storage Co.,* 38 N.Y.2d 445, 381 N.Y.S.2d 25, 343 N.E.2d 744 (1976). In *Kraut,* a bailor who brought a contract action against a commercial bailee was permitted to recover the ransom paid to the thief who stole the bailor's property while it was in the bailee's possession. But even if Hanover could be called a commercial bailee, Gordon has brought a fraud claim against Ross, not a contract claim against Hanover.[5] Moreover, a "ransom" is a "sum paid or agreed to be paid for the redemption of captured property." *Black's Law Dictionary* 1260 (6th ed.1990). Here, Gordon made a *secured loan* to Hanover, and in return Gordon received a promissory note from Hanover that (on its face) created a good claim in contract. It is undisputed that the loan was made with the expectation that Hanover would pay it back or (if not) that Hanover's property could be attached in satisfaction. Because Gordon was dealing with Hanover as "bailee" rather than with the holder of the property, and because Gordon had an expectation that the supposed "ransom" would be repaid in accordance with the terms of Hanover's note (se-

cured as it was Hanover's assets), this transaction has none of the earmarks of a ransom payment.

The majority's mitigation argument appears to me unsound for similar reasons. Under *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n,* 226 N.Y. 1, 122 N.E. 463 (1919), a fraud victim may recover expenses incurred in mitigating its damages. Indeed, as set forth above, if Gordon had actually paid $1.034 million *to the banks* in return for its securities, I might agree with the majority that Gordon could recover that sum as an expense to mitigate damages from the original fraud. But instead Gordon entered into a new contractual arrangement with parties it knew to be defrauders, and negotiated the security interests it required for that risky undertaking. It is evident to me that Gordon thereby abandoned and settled its original fraud claim, and took in exchange a new obligation that was rendered worthless by business risks that were either disclosed or (at any rate) are not alleged to have been fraudulently concealed. Because Gordon had a contractual right to repayment of the $1.034 million secured loan, that item cannot properly be deemed a mitigating "expense," and thus cannot be recovered in an action for fraud.

---

5. Unlike the thief to whom the ransom was paid in *Kraut,* Hanover did not illegally procure Gordon's property, even though it hypothecated that property to the banks in contravention of Ross's assurances.